IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

**FILED - GR**

September 24, 2021 11:14 AM
CLERK OF COURT
U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
BY: _tb_   SCANNED BY TB 9/24/21

T.S. a minor, K.S. a minor,
R.S. a minor, C.S. a minor,
by and through their parent,

Alan Staats II

**1:21-cv-832**
**Paul L. Maloney**
**United States District Judge**

Plaintiffs,

Case No.
Hon.

vs.

KENTWOOD PUBLIC SCHOOLS
BOARD OF EDUCATION;  KEVIN
POLSTON in his individual capacity and
in his official capacity as Superintendent of
Kentwood Public Schools;  and MARY (MIMI)
MADDEN, ALLEN YOUNG, PETE BATTEY,
ANGIE FORTON, ANGELA HOVERMALE,
SYLVIA JAMES, and JAMES LEWIS all in their
individual capacities and in their capacities
as members of the Kentwood Public Schools
Board of Education

**S.I.R.P.R.**

Defendants.

_Pro Se_
Alan Staats II
6728 Summerbreeze Dr. SE
Caledonia MI 49316
616-438-3710
alan.staats@gmail.com

## COMPLAINT

Plaintiffs, T.S., K.S., R.S., and C.S a minor, by and through their parent Alan Staats II, pro se, hereby file this Complaint against Defendants, Kentwood Public Schools; Kevin Polston in his individual capacity and in his official capacity as Superintendent of the Kentwood Public Schools and Mary (Mimi) Madden, Allen Young, Pete Battey, Angie Forton, Angela Hovermale, Sylvia James, And James Lewis all individual elected officials sued in their individual capacity and in their capacity as members of the Kentwood Public Schools Board of Education (collectively, "Defendants"). In support of the claims set forth herein, Plaintiffs allege and aver as follows:

~ 1 ~

## PARTIES

1. Plaintiffs T.S., K.S., R.S., and C.S are minor children who reside in Kentwood Public Schools District, in Kent County, Michigan. Plaintiffs T.S., K.S., R.S., and C.S are and were at all times relevant hereto a student at Kentwood Public Schools. Suit is brought herein on T.S., K.S., R.S., and C.S behalf by their Father, Plaintiff Alan Staats II.

2. Plaintiff, Alan Staats II is an adult individual who is a resident and taxpayer in the Kentwood Public Schools, in Kent County, Michigan. Plaintiff, Alan Staats II is the parent of T.S., K.S., R.S., and C.S.

3. Defendant, Kentwood Public Schools Board of Education (the "School Board" or the "Board") is a public entity which, acting under color of law, is responsible for the formulation and implementation of all official governmental laws, policies, regulations and procedures in effect for the Kentwood Public Schools.

4. Defendant, Kevin Polston was at all relevant times Superintendent of the Kentwood Public Schools in that capacity, acting under color of law, he is responsible for the implementation of all official governmental laws, policies, regulations and procedures governing the Kentwood Public Schools. He is sued in his official and individual capacities.

5. Defendant Mary (Mimi) Madden is a Kent County resident and member of the School Board, sued here in her individual and representative capacity. Mary (Mimi) Madden is currently the President of the School Board.

6. Defendant Allen Young is a Kent County resident and member of the School Board, sued here in his individual and representative capacity.

7. Defendant Pete Battey is a Kent County resident and member of the School Board, sued here in his individual and representative capacity.

8. Defendant Angie Forton is a Kent County resident and member of the School Board, sued here in her individual and representative capacity.

9. Defendant Angela Hovermale is a Kent County resident and member of the School Board, sued here in her individual and representative capacity.

10. Defendant Sylvia James is a Kent County resident and member of the School Board, sued here in her individual and representative capacity.

11. Defendant James Lewis is a Kent County resident and member of the School Board, sued here in his individual and representative capacity.

12. At all relevant times hereto, the School Board and the individual Defendants were acting under color of state law.

~ 2 ~

**JURISDICTION AND VENUE**

13. Plaintiffs incorporate the foregoing paragraphs as if set forth in full herein.

14. This Court has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. §1331, 28 U.S.C. §§1343(a)(3), (4), 28 U.S.C. §1367, 28 U.S.C. §2201, and 42 U.S.C. §1983.

15. There exists an actual and justiciable controversy between Plaintiffs and Defendant required resolution by this Court.

16. Plaintiffs have no adequate remedy at law.

17. Venue is proper before the United States District Court for the Western District of Michigan under 28 U.S.C. §1391 because all parties reside or otherwise are found herein, and all acts and omissions giving rise to Plaintiffs' claims occurred in the Western District of Michigan.

**FACTS**

18. Plaintiffs incorporate the foregoing paragraphs as if set forth in full herein.

**A. Kentwood Public Schools Board of Education**

19. The Kentwood Public Schools Board of Education is composed of seven members. The board members are elected by registered voters within the Kentwood Public Schools district and serve a four-year term (http://go.boarddocs.com/mi/kenwo/Board.nsf/goto?open&id=B3WL2450B19F)

20. The seven individuals currently serving as School Board Members are Defendants Mary (Mimi) Madden, Allen Young, Pete Battey, Angie Forton, Angela Hovermale, Sylvia James, And James Lewis.

21. Defendant Kevin Polston, Superintendent of the District, holds a Masters of Education and Bachelors of Arts Secondary Education and Teaching.

22. Defendant Mary (Mimi) Madden, the President of the School Board, has a Masters of Education. Pursuant to Mich. Const. art XI § 1, Mary (Mimi) Madden was required to sign an Oath of Office swearing to support the Constitution of the United States and the Constitution of the State of Michigan and to faithfully and impartially discharge her duties as a member (though she is now President of the School Board) to the best of her ability, and in accordance with the laws "now in effect and hereafter to be enacted." **EXHIBIT A**

23. Defendant Allen Young, pursuant to Mich. Const. art XI § 1 was required to sign an Oath of Office swearing to support the Constitution of the United States and the Constitution of the State of Michigan and to faithfully and impartially discharge his duties as a member

to the best of his ability, and in accordance with the laws "now in effect and hereafter to be enacted." **EXHIBIT A**

24. Defendant Angie Forton, pursuant to Mich. Const. art XI § 1 was required to sign an Oath of Office swearing to support the Constitution of the United States and the Constitution of the State of Michigan and to faithfully and impartially discharge her duties as a member to the best of her ability, and in accordance with the laws "now in effect and hereafter to be enacted." **EXHIBIT A**

25. Defendant Angela Hovermale, pursuant to Mich. Const. art XI § 1 was required to sign an Oath of Office swearing to support the Constitution of the United States and the Constitution of the State of Michigan and to faithfully and impartially discharge her duties as a member to the best of her ability, and in accordance with the laws "now in effect and hereafter to be enacted." **EXHIBIT A**

26. Defendant Sylvia James, pursuant to Mich. Const. art XI § 1 was required to sign an Oath of Office swearing to support the Constitution of the United States and the Constitution of the State of Michigan and to faithfully and impartially discharge her duties as a member to the best of her ability, and in accordance with the laws "now in effect and hereafter to be enacted." **EXHIBIT A**

27. Defendant James Lewis, pursuant to Mich. Const. art XI § 1 was required to sign an Oath of Office swearing to support the Constitution of the United States and the Constitution of the State of Michigan and to faithfully and impartially discharge his duties as a member to the best of his ability, and in accordance with the laws "now in effect and hereafter to be enacted." **EXHIBIT A**

28. Defendant Pete Battey, pursuant to Mich. Const. art XI § 1 was required to sign an Oath of Office swearing to support the Constitution of the United States and the Constitution of the State of Michigan and to faithfully and impartially discharge his duties as a member to the best of his ability, and in accordance with the laws "now in effect and hereafter to be enacted." **EXHIBIT A**

29. The seven-member School Board unanimously appointed Defendant Kevin Polston to serve as Superintendent of Schools, effective June 2, 2021.

30. As Superintendent, Kevin Polston is charged with the administration of the Kentwood Public Schools.

**B. Relevant Policies of the Kentwood Public Schools Board of Education**

31. Section 0000, po0121, titled "PHILOSOPHY OF THE BOARD" provides,

> A Board of Education is a legal entity for providing a system of public education within a geographic area of the State of Michigan. The system was created by, and is governed by, State statutes.

Members of a Board are chosen by citizens to represent them and the State in the governance of the local schools.

The Board has the dual responsibility for implementing statutory requirements pertaining to public education and for meeting the desires of residents. While the Board has an obligation to determine and assess citizen desires, it is understood that when the voters elect delegates to represent them in the conduct of specified educational programs, they, at the same time, are endowed with the authority to exercise their best judgment in determining policies, making decisions, and approving procedures for carrying out the responsibility.

The Board declares and, thereby, reaffirms its intent to:

A.      Maintain two-way communications with citizens of the District. The Board shall keep them informed of the progress and problems of the School District, and the citizens shall be urged to bring their aspirations and concerns about the District to the attention of this body.

B.      Establish policies and make decisions on the basis of declared educational philosophy and goals.

C.      Act as a truly representative body for citizens in all matters related to programs and operations. The Board recognizes that ultimate responsibility for public education rests with the State, but the Board of Education has been assigned specific authority through statute, and the Board shall not relinquish or fail to exercise that authority.

(http://go.boarddocs.com/mi/kenwo/Board.nsf/goto?open&id=B3WKZT5 0B11F)

32.  In addition, the Board's Policy Manual at Section 0000, po0121 provides,

The supervision of this District shall be conducted by the Board of Education, hereinafter sometimes referred to as the "Board", which is constituted and is governed by the laws of the State of Michigan.

(http://go.boarddocs.com/mi/kenwo/Board.nsf/goto?open&id=B3WKZR50B11C)

33.  Furthermore, for its "MISSION OF THE DISTRICT," the Policy Manual at section 2000, po2105 declares,

~ 5 ~

Kentwood Public Schools, together with parents and the community, will educate all students in a safe, secure environment. We are committed to excellence, equity and diversity in education. Our goal is for each student to master and apply the essential skills to be a successful, productive citizen.

(http://go.boarddocs.com/mi/kenwo/Board.nsf/goto?open&id=B3WL4F50B1F4)

34.  The Board Policy also provides in section 2000, po2112, in pertinent part,

E. Engaging Families in Decision Making and Advocacy

1.  engaging families as partners in the process of school review and continuous improvement planning;

2.  engaging families in the development of its District-wide parent and family engagement policy and plan, and distributing the policy and plan to families.

F. Collaborating with the Community

1.  building constructive partnerships and connecting families with community-based programs and other community resources;

2.  coordinating and integrating parent and family engagement programs and activities with District initiatives and community-based programs that encourage and support families' participation in their children's education, growth, and development.

(http://go.boarddocs.com/mi/kenwo/Board.nsf/goto?open&id=BD55G2774F73)

35.  Moreover, section 8000, po8420, titled "EMERGENCY SITUATIONS AT SCHOOLS," provides, in pertinent part,

The District shall develop emergency preparedness procedures that address the following goals and/or objectives:

1.  the health and safety of students and staff are safeguarded

2.  the time necessary for instructional purposes is not unduly diverted

3.  minimum disruption to the educational program occurs

4.  students are helped to learn self-reliance and trained to respond sensibly to emergency situations

(http://go.boarddocs.com/mi/kenwo/Board.nsf/goto?open&id=B3WLC
U50B30C)

36. Additionally, Kentwood Public Schools policy po8450.01, adopted by the Board on
September 14, 2020 and attached hereto as **Exhibit B**, explains that the Superintendent's
decision to require protective facial covering during pandemic and epidemic events was
made "in alignment with public health officials and/or in accordance with government
edicts and including any Pandemic Plan developed by the District's Pandemic Response
Team." Notably, the Policy states, "Facial masks/coverings generally should not include
surgical masks or respirators unless medically indicated (as those should be reserved for
healthcare workers) or masks designed to be worn for costume purposes." *Id.* (emphasis
added).

37. Finally, Kentwood Public Schools policy po1130 titled "CONFLICT OF INTEREST"
provides, in pertinent part,

   A. The maintenance of unusually high standards of honesty, integrity,
   impartiality, and professional conduct by School District's Board
   members, employees, officers, and agents is essential to ensure the
   proper performance of school business as well as to earn and keep public
   confidence in the School District.

   To accomplish this, the Board of Education has adopted the following
   guidelines which apply to all District employees, officers and agents,
   including members of the Board to assure that conflicts of interest do
   not occur. These guidelines are not intended to be all inclusive, nor to
   substitute for good judgment on the part of all employees, officers, and
   agents.

      1. No employee, officer, or agent shall engage in or have a financial
      or other interest, directly or indirectly, in any activity that conflicts
      or raises a reasonable question of conflict with his/her duties and
      responsibilities in the school system. When a staff member
      determines that the possibility of a personal interest conflict exists,
      s/he should, prior to the matter being considered by the Board or
      administration, disclose his/her interest (such disclosure shall
      become a matter of record in the minutes of the Board).

      2. No staff member, officer, or agent shall use his/her position to
      benefit either himself/herself or any other individual or agency
      apart from the total interest of the School District.

   ***

   C. Employees, officers, and agents can not participate in the selection,
   award, or administration of a contract supported by a Federal

~ 7 ~

grant/award if s/he has a real or apparent conflict of interest. Such a conflict of interest would arise when the employee, officer, or agent, any member of his/her immediate family, his/her partner, or an organization which employs or is about to employ any of the parties described in this section, has a financial or other interest in or a tangible personal benefit from a firm considered for a contract.

\*\*\*

E. Employees, officers and agents must disclose any potential conflict of interest which may lead to a violation of this policy to the School District. Upon discovery of any potential conflict of interest, the School District will disclose, in writing, the potential conflict of interest to the appropriate Federal awarding agency or, if applicable, the pass-through entity.

See attached **Exhibit C** (emphasis added).

## C. Kentwood Public Schools COVID-19-Based Measures

38. On August 17, 2021, the Kentwood Public Schools, through Defendant Kevin Polston, issued a "Parent Communication Letter." See **Exhibit D**. In its section "Return to School Plans", Kentwood Public Schools states ("the mask mandate"),

"In response to the contagious Delta variant, the KCHD and Michigan Department of Health & Human Services (MDHHS) have recently released a public order and strong recommendations regarding schools and COVID-19. The KCHD order details the requirements for isolation, quarantine, and reporting cases while the recommendation of both agencies sets expectations for the school and community to layer preventative strategies, including the recommendation for the required use of face coverings."

\*\*\*

"Following the KCHD and MDHHS **recommendations**, we are mandating the use of face coverings by staff, students, and visitors while indoors." (emphasis added).

39. On August 20, 2021, Kentwood Public Schools, through Defendant Kevin Polston, issued a "Parent Communication Letter." See **Exhibit E**, in which the Kentwood Public Schools stated:

"Today, the Kent County Health Department (KCHD) issued a new Public Health Order mandating the use of face coverings in grades PK-6. **The Order from the KCHD affirms the decision by Kentwood Public Schools (KPS) to implement the district plan communicated on August**

**17, 2021**. KPS mandates the use of face coverings during the school day in grades PK-12 by staff, students, and visitors while indoors. **KPS will continue to carefully evaluate what is necessary to ensure the safety and wellbeing of our students and staff by monitoring conditions as they evolve."** (emphasis added).

In addition, the mask mandate states "When contact tracing, the August 6 KCHD Order stipulates that if both students associated with a positive case (the positive student and the close contact) are wearing a face covering, only close contacts within three feet will be quarantined. **Therefore, wearing a face covering reduces the risk of your child being quarantined at school."** (original emphasis)

40. Plaintiff, Alan Staats II relies on THE REVISED SCHOOL CODE (EXCERPT) Act 451 of 1976, Statement of prohibited practices, 380.1307b (h) and (k), which states:

> The state policy under section 1307a shall include a clear statement that all of the following practices are prohibited for school personnel in the public schools of this state under all circumstances, including emergency situations:
>
> > (h) Any restraint that negatively impacts breathing.
> >
> > (k) Any other type of restraint.

Attached hereto as **Exhibit F**.
See also, Michigan Legislature - Section 380.1307b

## D. The Masking Requirement Causes Immediate and Irreparable Harm to Students, Staff, Community.

1. Plaintiff, Alan Staats II also relies on Maras v. Mayfield City School District Board of Education, Case No. 1:21 CV 1711, a pending action in the United States District Court Northern District of Ohio, Exhibit O of Plaintiff's Complaint, the Affidavit of Stephen E. Petty, attached hereto as **Exhibit G**. Stephen E. Petty, an expert environmental toxicologist who is qualified to speak to the health and safety benefits of masks. Mr. Petty is an expert in the field of Industrial Hygiene who has testified as to the futility and danger cause by an individual wearing a mask in order to avoid transmitting or becoming infected with Covid-19, states the following:

> ***
> ***
> 1. I hold relevant industry certifications including board certifications as a C.I.H. (Certified Industrial Hygienist), a C.S.P. (Certified Safety Professional), and as a P.E. (Professional Engineer) in six states (Florida, Kentucky, Ohio, Pennsylvania, Texas and West Virginia). My curriculum is attached hereto as Affidavit **Exhibit i**.

~ 9 ~

2.    I have served as an expert tin personal protective equipment and related disciplines in approximately 400 legal cases. I have often been certified as, and provided testimony as, an expert in these areas. My list of representative cases is attached hereto as Affidavit **Exhibit ii.**

3.    Fore example, I am currently serving as an expert in the Monsanto Roundup and 3-M PFAS litigation. Recently I testified in four trials for the DuPont C-8 litigation.

4.    I taught Environmental and Earth Sciences as an adjunct professor at Franklin University.

5.    I hold nine U.S. patents, most related to heating, ventilation and air conditioning (HVAC) systems.

6.    I am a current member in good standing of the following relevant associations: American Industrial Hygiene Association (AIHA), American Board of Industrial Hygiene (ABIH), American Conference of Governmental Ind. Hygienists (ACGIH), American Institute of Chemical Engineers (AIChE), American Society of Refrigeration, Air Conditioning and Refrigeration Engineers (ASHRAE); Member ASHRAE 40 Std. and TC 2.3, and Sigma Xi.

7.    I am an expert in the field of Industrial Hygiene, which is the science and art devoted to the anticipation, recognition, μevaluation, and control of those environmental factors or stressors – including viruses – arising in or from the workplace, which may cause sickness, impaired health and well-being, or significant discomfort among workers or among the citizens of the community.

8.    Industrial Hygiene is fundamentally concerned the proper methods of mitigating airborne/dermal hazards and pathogens, as well as with the design and use of engineering controls, administrative controls and personal protective equipment, among other things.

9.    Medical doctors, virologists, immunologists, and many public health professionals are not qualified experts in these areas by virtue of those aforementioned credentials.

10.   On May 7, 2021, the Centers for Disease Control (CDC) updated its guidance, providing that the primary mechanism for transmission of Covid-19 is through airborne aerosols, and not, as previously stated, by touching contaminated surfaces or through large respiratory droplets, as also stated during previous periods of the pandemic.

11.   Airborne viral aerosols can consist of a single viral particle or multiple viral particles clumped together, and usually smaller than 5μ (microns) in size. By comparison, droplets are <5μ to <10μ in size.

12.   A square micron is approximately 1/4000th the area of the cross-section of a human hair and 1/88th the diameter of a human hair. Covid particles are – 1/10 of a micron or – 1/40,000th the area of a cross section of a human hair or – 1/1,000th the diameter of a human hair.

13.   A recent University of Florida study capturing air samples within an enclosed automobile cabin occupied by a Covid-positive individual showed that the only culturable Covid-19 virus samples obtained were between 0.25μ to 0.5μ in size. Particles smaller than 5μ are considered very small and/or very fine or aerosols.

14.   Very small particles do not fall by gravity in the same rate that larger particles do and can stay suspended in still air for a long time, even days to weeks.

15.   Because they stay suspended in concentration in indoor air, very small particles can potentially accumulate and become more concentrated over time indoors if the ventilation is poor.

16.   Very small airborne aerosols pose a particularly great risk of exposure and infection because, since they are so small, they easily reach deep into the lung. This explains in part why Covid-19 is so easily spread, and why so little Covid-19 is required for infection.

17.   Exposure to airborne aerosols is a function of two primary parameters: concentration and time. Less is better regarding both parameters.

18.   For many reasons, personal protective equipment (PPE) is the least desirable way to protect people from very small airborne aerosols. Moreover, masks are not PPE since they cannot be sealed and do not meet the provisions of the Occupational Safety and Health Administration (OSHA) Respiratory Protection Standard (RPSJ), namely 29 CFR 1910.134.

19.   Regarding PPE, facial coverings do not effectively protect individuals from exposure to very small airborne aerosols. A device referred to as a respirator is required to provide such protection.

20.    The AIHA, in their September 9, 2020 Guidance Document for COVID-19 (Affidavit **Exhibit iii**) noted that the acceptable relative risk reduction methods must be ≥ 90% mask were shown to be only 10% and 5% (See Affidavit **Exhibit iii** – Figure 2) and far below the required 90% level.

~ 11 ~

21.     Similarly, Shah, et al, 2021 (Affidavit **Exhibit iv**), using ideally sealed masks and particles 1 micron in size, reported efficiencies for the more commonly used cloth masks and surgical masks of 10% and 12% respectively. No mask can be perfectly sealed; thus "real world" effectiveness would be even lower. \

22.     Industrial Hygienists refer to a Hierarchy of Controls" that are typically implemented to minimize exposures, including exposures to very small airborne aerosols like Covid-19.

23.     Regarding practical or "engineering" controls, industrial hygienists focus on practices that dilute, destroy, or contain airborne hazards (or hazards in general).

24.     PPE – especially facial coverings – do not dilute, destroy, or contain airborne hazards. Therefore, facial coverings do not appear anywhere in the Industrial Hygiene *IH) Hierarchy of Controls for very small airborne aerosols like Covid-19. Even respirators (part of the PPE Category and not masks) are in the las priority on the Hierarchy of Controls.

25.     Facial coverings are not comparable to respirators. Leakage occurs around the edges of ordinary facial coverings. Thus, ordinary facial coverings <u>do not</u> provide a reliable level of protection against inhalation of very small airborne particles and are not considered respiratory protection.

26.     For example, during the seasonal forest fires in the summer of 2020, the CDC issues public guidance warning that facial coverings provide o protection against smoke inhalation. That is because facial coverings do not provide a reliable level of protection against the small particles of ash contained in smoke. Ash particles are substantially larger than Covid-19 aerosolized particles.

27.     Ordinary facial coverings like the ones required by the Kentwood Public Schools facial covering policy do not meet any of the several key OSHA Respiratory Protection Standards for respirators.

28.     Because of the gaps around the edges of facial coverings required by Kentwood Public Schools policy, they do not filter out Covid-19 aerosols. The policy stating masks will be worn without gaps defies known science that masks worn today cannot be sealed and always have gaps.

29.     The effectiveness of a cloth facial covering falls to zero when there is a 3% or more open area in the edges around the sides of the facial covering.

30.     Most over-the-counter disposable facial coverings have edge gaps of 10% or more. When adult-sized facial coverings are used by children, edge gaps will usually greatly exceed 10%.

32.     Even short breaks (e.g., to eat) expose individuals to Covid-19 aerosols in indoor spaces.

33.     Ordinary cloth facial coverings like the ones required by the Kentwood Public Schools mask requirement do not provide any filtering benefit relative to particles small than 5µ if not sealed.

34.     Substantial mitigation of Covid-19 particles could be immediately achieved by:

   a.     opening windows and using fans to draw outdoor air into indoor spaces (diluting the concentration of aerosols),
   b.     setting fresh air dampers to maximum opening on HVAC systems,
   c.     overriding HVAC energy controls,
   d.     increasing the number of times indoor air is recycled,
   e.     installing needlepoint ionization technology to HVAC intake fans, and
   f.     installing inexpensive ultraviolet germicide devices into HVAC systems.

35.      All of the above-referenced techniques are more effective and meet standard industrial hygiene hierarchy of controls (practices) for controlling exposures in place for nearly 100 years. The use of cloth facial coverings do not fit within these basic hierarchy of controls since masks are not PPE and cannot be sealed. There are no OSHA standards for facial coverings (masks) as respiratory protection.

36.     Extended use of respiratory PPE is not indicated without medical supervision.

37.     As explained in an article titled "Is a Mask That Covers the Mouth and Nose Free from Undesirable Side Effects in Everyday Use and Free of Potential Hazards?" that was published on April 20, 2021, in the International Journal of Environmental Research and Public Health and that is attached to this Affidavit as **Exhibit iv**, the following negative effects from wearing masks was reported in the literature:

increased risk of adverse effects when using masks:

| Internal diseases | Psychiatric Illness | Neurological Diseases |
| COPD | Claustrophobia | Migraines and Headache Sufferers |
| Sleep Apnea Syndrome | Panic Disorder | Patients with Intracranial Masses |
| advanced renal Failure | Personality Disorders | Epilepsy |
| Obesity | Dementia | |
| Cardiopulmonary Dysfunction | Schizophrenia | |
| Asthma | helpless Patients | |
| | fixed and sedated Patients | |

| Pediatric Diseases | ENT Diseases | Occupational Health Restrictions |
| Asthma | Vocal Cord Disorders | moderate / heavy physical Work |
| Respiratory diseases | Rhinitis and obstructive Diseases | |
| Cardiopulmonary Diseases | | Gynecological restrictions |
| Neuromuscular Diseases | Dermatological Diseases | Pregnant Women |
| Epilepsy | Acne | |
| | Atopic | |

**Figure 5.** Diseases/predispositions with significant risks, according to the literature found, when using masks. Indications for weighing up medical mask exemption certificates.

Example statements made in the paper include the following: "The overall possible resulting measurable drop in oxygen saturation (O2) of the blood on the one hand and the increase in carbon dioxide (CO2) on the other contribute to an increased noradrenergic stress response, with heart rate increase and respiratory rate increase, in some cases also to a significant blood pressure increase." **Exhibit iv**, p. 25. In fact, "Neither higher level institutions such as the WHO or the European Centre for Disease Prevention and Control (ECDC) nor national ones, such as the Center for Disease Control and Prevention, GA, USA (CDC) or the German RKI, substantiate with sound scientific data a positive effect of masks in the public (in terms of a reduced rate of spread of COVID-19 in the population)." **Exhibit iv**, p. 24. For these reasons, students who are required to wear masks pursuant to a mandate suffer immediate and irreparable injury, loss, or damage.

38.   In summary:
    a.   PPE is the least desirable way to protect people from very small airborne aerosols.
    b.   Facial coverings as required by the MCSD policy are not recognized as PPE since they cannot be sealed and are not covered by the OSHA RPS.
    c.   If PPE were to be used for protection, respirators, not facial coverings as required by the MCSD policy are needed to provide any effective protection from very small airborne aerosols.
    d.   Very small aerosol particles are more likely to be a greater cause of disease than respiratory droplets because they can evade PPE and reach deep into the lungs, whereas respiratory droplets have to work against gravity in order to travel up a person's nose into the sinus.
    e.   Much better alternatives to controlling exposure are available (i.e., engineering controls of dilution – ventilation with increased fresh air and destruction), and should be used to minimize exposures as opposed to masks.

  f. Individuals who are required to wear masks pursuant to a mandate suffer immediate and irreparable injury, loss, and damage due to the overall possible resulting measurable drop in oxygen saturation of the blood on one hand and the increase in carbon dioxide on the other, which contributes to an increased noradrenergic stress response, with heart rate increase and respiratory rate increase and, in some cases, a significant blood pressure increase.

41. Plaintiff, additionally relies on 47 published studies showing that masks don't work and are harmful children that can be located at: https://www.yorechildren.com/blog/2021/9/17/for-the-umpteenth-time-masks-dont-work-and-are-harmful-to-children-47-studies **(Exhibit K)**

42. Plaintiffs note that the state of Michigan was given $3,719,833,128 (ARP-ESSER-twothird-onethird-Allocations_Final-1.pdf (ed.gov) **Exhibit H)** pursuant to the American Rescue Plan (ARP") Act of 2021 by agreeing to implement the federal guidelines set forth by the CDC for COVID-19 mitigation efforts. See the attached letter from the U.S. Secretary of Education, attached hereto as **Exhibit I**. See also, Michigan-ARP-ESSER-State-Plan.pdf (ed.gov).

  The letter (ARP_Letter_Sec_to_Chiefs_FINAL.pdf (ed.gov) **Exhibit J)** links to the CDC guidelines available at Operational Strategy for K-12 Schools through Phased Prevention | CDC. The guidelines suggest that a school board would forfeit ARP allocations by making masks optional, and states that have prohibited mask mandates in schools have received letters notifying them that they will not receive ARP funds. Accordingly, it seems Defendants have a financial incentive for implementing the mask mandate, despite that such a requirement serves no scientific purpose and subjects individuals who wear masks to the health risks discussed above.

43. Plaintiff Alan Staats II, in his own capacity and on behalf of his minor children, T.S., K.S., R.S., and C.S, is aggrieved by the immediate and irreparable injury, loss, and damage suffered by T.S., K.S., R.S., and C.S because T.S., K.S., R.S., and C.S are required to wear a mask pursuant to the School Board's mask mandate, which is not only unsupported by science, but which also results in the possible resulting measurable drop in oxygen saturation of the blood on one hand and the increase in carbon dioxide on the other, which contributes to an increased noradrenergic stress response, with heart rate increase and respiratory rate increase and, in some cases, a significant blood pressure increase.

## COUNT I – 42 U.S.C. §1983 – Violation of Procedural Due Process (5th and 14th Amendments) Against All Defendants

44. Plaintiffs incorporate the foregoing paragraphs as if set forth in full herein.

45.     In order establish a claim under section 1983 of the Civil Rights Act, a plaintiff must prove a Defendant: (a) acted under the color of state law; (b) proximately causing; (c) the Plaintiff to be deprived of a federally protected right. 42 U.S.C. §1983.

46.     In the instant case, Defendants unquestionably acted under the color of state law.

47.     Each Individual Defendant is an elected, voting member of the Kentwood Public Schools Board of Education with the exception of Defendant Kevin Polston, who is the Superintendent of the Kentwood Public Schools.

48.     Under the Fifth Amendment to the Constitution, no person may be deprived of life, liberty, or property without due process of law. U.S. Const. Ann., Amendment V.

49.     The Fourteenth applies the protections of the Fifth Amendment to state actors. U.S. Const. Ann., Amendment XIV.

50.     Plaintiffs have constitutionally protected interests in the benefits that come from the not being subject to the Board's mask mandate, including the ability to pursue an education without being subjected to health risks that are not offset by any scientifically provable benefits.

51.     Defendants' implementation of the mask policy unlawfully deprives Plaintiffs of these and other constitutionally-protected interests without due process of law. Such deprivation occurred with no notice or meaningful opportunity to be heard as the Superintendent instated the mask mandate prior to offering an opportunity for public discussion. Such deprivation was arbitrary, capricious, based on ignorance without inquiry into facts, and n violation of the School Board's own policies and other applicable laws. Such deprivation violates the Fifth and Fourteenth Amendments of the United States Constitution.

52.     Plaintiffs were harmed and continue to be irreparably harmed by these unlawful acts, including by suffering an overall possible simultaneous drop in oxygen saturation of the blood and increase in carbon dioxide, which contributes to an increased noradrenergic stress response, with heart rate increase and respiratory rate increase and, in some cases, a significant blood pressure increase. Additionally, everyday use of a mask that covers the mouth and nose may have possible side effects or potential hazards as stated in Stephen E. Petty's Affidavit, Exhibit v, page 5 (**EXHIBIT G**), which includes the following:

> Figure 5. Diseases/predispositions with significant risks, according to the literature found, when using masks. Indications for weighing up medical mask exemption certificates.
>
> • Internal Diseases: COPD, Sleep Apnea Syndrome, Advanced Renal Failure, Obesity, Cardiopulmonary Dysfunction, Asthma.

- Pediatric Diseases: Asthma, Respiratory diseases, Cardiopulmonary Diseases, Neuromuscular Diseases, Epilepsy.
- Psychiatric Illness: Claustrophbia, Panic Disorder, Personality Disorders, Dementia, Schizophrenia, helpless patients, fixed and sedated patients.
- ENT Diseases: Vocal Cord Disorders, Rhinitis and obstructive diseases.
- Dermatological Diseases: Acne; Atopic.
- Neurological Diseases: Migraines and Headache sufferers, Patients with intracranial Masses, Epilepsy.

## COUNT II – 42 U.S.C. §1983 – Violation of Substantive Due process (Fourteenth Amendment) – Against All Defendants

53.     Plaintiffs incorporate the foregoing paragraphs as if set forth in full herein.

54.     In order establish a claim under section 1983 of the Civil Rights Act, a plaintiff must prove a Defendant: (a) acted under the color of state law; (b) proximately causing; (c) the Plaintiff to be deprived of a federally protected right. 42 U.S.C. §1983.

55.     In the instant case, Defendants unquestionably acted under the color of state law.

56.     Each individual Defendant is an elected, voting member of the Kentwood Public Schools Board of Education with the Exception of Defendant Kevin Polston, who is the Superintendent of the Kentwood Public Schools.

57.     Under the Fourteenth Amendment to the Constitution, and as established by state law including the state created danger doctrine, Plaintiffs have a fundamental right to a public education and to an education in a safe and healthy environment.

58.     Plaintiffs were harmed and continue to be irreparably harmed by these unlawful acts, including by suffering an overall possible simultaneous drop in oxygen saturation of the blood and increase in carbon dioxide, which contributes to an increased noradrenergic stress response, with heart rate increase and respiratory rate increase and, in some cases, a significant blood pressure increase. Additionally, everyday use of a mask that covers the mouth and nose may have possible side effects or potential hazards as stated in Stephen E. Petty's Affidavit, Exhibit v, page 5 **(EXHIBIT G)**, which includes the following:

> Figure 5. Diseases/predispositions with significant risks, according to the literature found, when using masks. Indications for weighing up medical mask exemption certificates.

- Internal Diseases: COPD, Sleep Apnea Syndrome, Advanced Renal Failure, Obesity, Cardiopulmonary Dysfunction, Asthma.
- Pediatric Diseases: Asthma, Respiratory diseases, Cardiopulmonary Diseases, Neuromuscular Diseases, Epilepsy.
- Psychiatric Illness: Claustrophbia, Panic Disorder, Personality Disorders, Dementia, Schizophrenia, helpless patients, fixed and sedated patients.
- ENT Diseases: Vocal Cord Disorders, Rhinitis and obstructive diseases.
- Dermatological Diseases: Acne; Atopic.
- Neurological Diseases: Migraines and Headache sufferers, Patients with intracranial Masses, Epilepsy.

## COUNT III – Violation of Procedural Due Process
## (Michigan Constitution Art. I, §17) Against All Defendants

59.  Plaintiffs incorporate the foregoing paragraphs as if set forth in full herein.

60.  Article I, §17 of the Michigan Constitution provides, "No person shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty or property, without due process of law. The right of all individuals, firms, corporations and voluntary associations to fair and just treatment in the course of legislative and executive investigations and hearings shall not be infringed.

61.  Article I, §17 of the Michigan Constitution affords the people of Michigan with the right to be free from violations of the procedural due process rights, and no person may be deprived of life, liberty, or property without due process of law.

62.  Plaintiffs have constitutionally protected interests in the benefits that come from the not being subject to the Board's mask mandate, including the ability to pursue an education without being subjected to health risks that are not offset by any scientifically provable benefits.

63.  Defendants' implementation of the mask policy unlawfully deprives Plaintiffs of these and other constitutionally-protected interests without due process of law. Such deprivation occurred with no notice or meaningful opportunity to be heard as the Superintendent instated the mask mandate prior to offering an opportunity for public discussion. Such deprivation was arbitrary, capricious, based on ignorance without injury into facts, and in violation of the School Board's own policies and other applicable laws. Such deprivation violates Article I, §17 of the Michigan Constitution as well as Revised School Code Act 451 of 1976, Section 380.10, which states:

> 380.10 Rights of parents and legal guardians; duties of public schools. Sec. 10. It is the natural, fundamental right of parents and legal guardians to

determine and direct the care, teaching, and education of their children. The public schools of this state serve the needs of the pupils by cooperating with the pupil's parents and legal guardians ....

64.     Plaintiffs were harmed and continue to be irreparably harmed by these unlawful acts, including by suffering an overall possible simultaneous drop in oxygen saturation of the blood and increase in carbon dioxide, which contributes to an increased noradrenergic stress response, with heart rate increase and respiratory rate increase and, in some cases, a significant blood pressure increase. Additionally, everyday use of a mask that covers the mouth and nose may have possible side effects or potential hazards as stated in Stephen E. Petty's Affidavit, Exhibit v, page 5 (**EXHIBIT G**), which includes the following:

> Figure 5. Diseases/predispositions with significant risks, according to the literature found, when using masks. Indications for weighing up medical mask exemption certificates.

- Internal Diseases: COPD, Sleep Apnea Syndrome, Advanced Renal Failure, Obesity, Cardiopulmonary Dysfunction, Asthma.
- Pediatric Diseases: Asthma, Respiratory diseases, Cardiopulmonary Diseases, Neuromuscular Diseases, Epilepsy.
- Psychiatric Illness: Claustrophbia, Panic Disorder, Personality Disorders, Dementia, Schizophrenia, helpless patients, fixed and sedated patients.
- ENT Diseases: Vocal Cord Disorders, Rhinitis and obstructive diseases.
- Dermatological Diseases: Acne; Atopic.
- Neurological Diseases: Migraines and Headache sufferers, Patients with intracranial Masses, Epilepsy.

### COUNT IV – Violation of Substantive Due Process
### (Michigan Const. Art. I, §17) Against All Defendants

65.     Plaintiffs incorporate the foregoing paragraphs as if set forth in full herein.

66.     Article I, §17 of the Michigan Constitution provides, "All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay. Suits may be brought against the state, in such courts and in such manner, as may be provided by law."

67.     Article I, §17 of the Michigan Constitution affords the people of Michigan with the right to be free from violations of the procedural due process rights, and no person may be deprived of life, liberty, or property without due process of law.

68.     Under Article VIII, §2 of the Michigan Constitution Article VIII, §2 of the
        Michigan Constitution, and as established by state law including the state created
        danger doctrine, Plaintiffs have a fundamental right to a public education without
        any form of medical discrimination or segregation.

69.     Plaintiffs were harmed and continue to be irreparably harmed by these unlawful
        acts, including by suffering an overall possible simultaneous drop in oxygen
        saturation of the blood and increase in carbon dioxide, which contributes to an
        increased noradrenergic stress response, with heart rate increase and respiratory rate
        increase and, in some cases, a significant blood pressure increase. Additionally,
        everyday use of a mask that covers the mouth and nose may have possible side
        effects or potential hazards as stated in Stephen E. Petty's Affidavit, Exhibit v, page
        5 **(EXHIBIT G)**, which includes the following:

        Figure 5. Diseases/predispositions with significant risks, according to
        the literature found, when using masks. Indications for weighing up
        medical mask exemption certificates.

        - Internal Diseases: COPD, Sleep Apnea Syndrome, Advanced Renal
          Failure, Obesity, Cardiopulmonary Dysfunction, Asthma.
        - Pediatric Diseases: Asthma, Respiratory diseases, Cardiopulmonary
          Diseases, Neuromuscular Diseases, Epilepsy.
        - Psychiatric Illness: Claustrophbia, Panic Disorder, Personality
          Disorders, Dementia, Schizophrenia, helpless patients, fixed and
          sedated patients.
        - ENT Diseases: Vocal Cord Disorders, Rhinitis and obstructive
          diseases.
        - Dermatological Diseases: Acne; Atopic.
        - Neurological Diseases: Migraines and Headache sufferers, Patients
          with intracranial Masses, Epilepsy.

## RESERVATION OF RIGHTS

Plaintiffs herein expressly reserve their rights in regard to any additional claims to which
they may be entitled under federal law as well as under the laws of the State of Michigan or other
violations or actions of misconduct that may have been committed by Defendants. Plaintiffs
expressly place Defendants on notice of Plaintiffs' intention to initiate removal proceedings at the
state court level against Defendants as a result of the infractions Defendants have committed, as
described herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court grant the following relief:

a.      Assume jurisdiction of this action:

b.      Vacate and set aside the Defendants' mask mandate as well as any other action taken by Defendants to institute the mask mandate and implement the provisions of the mask policy;

c.      Declare that the institution of the mask policy and actions taken by Defendants to implement the mask policy are arbitrary, capricious, based on ignorance due to failure to inquire into facts, otherwise not in accordance with law, and without observance of required procedures;

d.      Declare that the mask policy and the actions taken by Defendants to implement the mask policy are in violation of the Constitution and contrary to the laws of the United States, the State of Michigan, and the Revised School Code Act 451 of 1976.

e.      Temporarily restrain, as well as preliminarily and permanently enjoin Defendants, their agents, servants, employees, attorneys, and all persons in active concert or participation with any of them, from implementing or enforcing the mask policy and from taking any other action to implement the masking policy that is not in compliance with applicable law; and

f.      Grant such other and further relief as may be just, equitable, and proper including without limitation, an award of attorneys' fees and costs to Plaintiffs.

Respectfully submitted,

BY: /s/ Alan Staats II
    Alan Staats II
    *Pro Se*
    6728 Summerbreeze Dr.
    Caledonia MI 49316
    alan.staats@gmail.com

Dated:    9/18/21